716 So.2d 949 (1998)
STATE of Louisiana, Appellee,
v.
Calvin TOLBERT, Appellant.
No. 30821-KA.
Court of Appeal of Louisiana, Second Circuit.
August 19, 1998.
*951 Piper & Associates by Anthony Hollis, Shreveport, for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Howard Fish, Catherine M. Estopinal, Assistant District Attorneys, for Appellee.
Before NORRIS, HIGHTOWER and STEWART, JJ.
STEWART, Judge.
Defendant, Calvin Tolbert, appeals a conviction of first degree murder in the 1st Judicial District Court, Parish of Caddo, the Honorable Ramona Emanuel presiding. We affirm the conviction and sentence.

FACTS
Wilma Liberto and her son Paul were the proprietors of Liberto's Grocery, a neighborhood grocery store in Shreveport, Louisiana, operated by the Liberto family since 1953. On the afternoon of August 1, 1994, the Libertos were working in their store, cashing checks for their patrons. The first day of each month was a particularly busy day, and the Libertos had more than $28,000 in cash in the store for check cashing purposes. Paul Liberto, a former Marine, wore a handgun on his hip as he worked.
Calvin Tolbert, the defendant, and four of his friends-Marcus Randle, Sancho Rushing, Jarod Dickson and Antoine Holmes-planned to rob the Libertos of their check cashing bankroll. At about 1:15 p.m., the men came in and began to "case" the store but left because the store was full of customers cashing checks. Some minutes later when there were fewer customers, Tolbert, Randle, and Rushing reentered the store.
LaTonya Dillard, sitting across the street from the Libertos' store, watched the men as they went inside. Noticing that Tolbert had a gun, she called 911 and summoned police.
As the men reentered, Margaret Smith and her son Jimmy were at the store's counter where Paul Liberto had just begun to cash Ms. Smith's check. Suddenly, without making a demand or saying anything at all, Calvin Tolbert drew a pistol and shot Paul Liberto in the neck. As the gun went off in Ms. Smith's ear, stunning her, Tolbert turned and shot 77 year-old Wilma Liberto in the face. Both of the Libertos fell to the floor, immobilized. Randle then drew his own weapon and shot the helpless Paul Liberto once in the back. The men took several hundred dollars from the cash register. All of these events were recorded by the store's video surveillance system, but as the men left, Rushing switched the system off. Tolbert, Randle and Rushing fled the scene.
The Smiths ran out of the store, and Jimmy Smith watched as another man, wearing a ski mask, went into the store. After Mr. Smith heard a sound like a gunshot, the masked man, later identified as Dickson, ran back out of the store. Detrick Gilyard, a *952 neighborhood youth, saw Holmes and the masked Dickson go into and leave the store. He testified that Dickson was carrying cash as he left and that the 15-year-old Holmes had his hands up as he ran away. Paul Liberto said that one of the persons who entered the store the second time fired a shot at him but missed.
Michael Gilyard, 8 years old at the time, heard the gunshots and said that he saw the men leaving the scene carrying money, guns and a videotape. He knew two of the men by their first names, Calvin and Jarod, and identified Tolbert as one of the men fleeing the store with a gun and money. He knew Tolbert as a friend of his brother, Roberto. He also saw Dickson put on his ski mask and go in and out of the store.
Roberto Gilyard testified that he was walking down an alley to Liberto's Grocery when he heard four shots and saw his friend, the defendant, running out of the store with money in his hand. He also saw a man, who he identified as Rushing, carrying a videotape.
Jimmy Smith positively identified Tolbert as the man who shot Paul Liberto, although he said that Tolbert did not shoot Wilma Liberto. LaTonya Dillard saw the robbers running from the scene and specified that Tolbert had a gun in his hand as he fled. She ran to the store to check on the Libertos and called 911 again.
Wilma Liberto died on the floor from the gunshot wound to her head. Paul Liberto survived his wounds but was left paralyzed in his left arm and from the waist down.
Police found four spent cartridge cases on the floor of the Libertos' store. They also recovered the bullet fired by Dickson, which hit the counter, and the coroner removed a 9 mm bullet from Mrs. Liberto's head. No firearm belonging to the robbers was ever found. Paul Liberto's gun was unfired. Investigators were unable to lift identifiable fingerprints from the scene, but they did find the store's surveillance videotape still in the VCR. Jacoby Dickson, Jarod Dickson's brother, was questioned by police and ultimately identified Tolbert, Randall and Rushing from the videotape.
After the murder, Tolbert, Randall and Rushing went to the Shreveport apartment of Sharita Reliford. Shortly after the men arrived, she saw a report of the Liberto murder on television, became aware that the men were involved in the crime, and made the men leave her apartment. The three men drove to Houston but surrendered to Houston police on August 11, 1994. Tolbert was subsequently charged with the first degree murder of Wilma Liberto.
The four other participants in the robbery testified at the defendant's trial, and each testified pursuant to an agreement with the state. For their testimony, the men obtained the following plea agreements:
Randall: Armed robbery, attempted second degree murder.
Rushing: Armed robbery.
Dickson: Simple robbery.
Holmes: Immunity from prosecution.
Randall testified that just before the robbery, the men discussed their plan to go into the Libertos' store, "lay them down," leave "no witnesses" and steal the money. He said that the defendant was "down with [the plan] too." Randall said that Tolbert shot both Paul and Wilma Liberto and also admitted that he shot "at" Paul Liberto. Randall testified that Rushing was armed.
Rushing testified that his job during the robbery was to take the surveillance videotape, but said that he was unable to remove the tape from the video equipment. He said that he was unarmed. Rushing testified that Tolbert shot both Paul and Wilma Liberto and that Randall shot Paul Liberto. Rushing said that he, Randall, and Tolbert fled to his sister's apartment where they divided the money. Rushing testified that he got "three or four hundred dollars" and that the others got "pretty much the same." He admitted that he had earlier told police that he did not see Tolbert shoot the Libertos and then testified that he did not actually see the shooting but saw the immediate aftermath of the shooting.
Jarod Dickson identified Tolbert, Randle, and Rushing as the robbers. Dickson admitted to stealing money from the store after those men left but denied shooting at Paul *953 Liberto. Antoine Holmes also testified that Tolbert, Randle and Rushing planned and executed the robbery but said that Dickson had fired at Paul Liberto after the others had fled. He also said that as the men planned the robbery, Tolbert said that they were going to have to shoot the Libertos because they were armed. Holmes admitted lying to police during earlier statements.
Sharita Reliford testified that, just before she testified, the defendant's cousin, Eric Mack, asked her to lie and say that she heard Marcus Randall say that he shot Mrs. Liberto. Ms. Reliford stated that she did not hear the men say anything while they were at her apartment.
The defendant argued to the jury that he intended to shoot Paul Liberto because he was armed and to rob the store, but that he neither intended to or actually shot Wilma Liberto. The defendant's theory was disproven, however, by the videotape evidence which shows him shooting Paul Liberto and then shooting Wilma Liberto at the same time that Rushing shot Paul Liberto.
Based upon the record evidence, the jury convicted the defendant of first degree murder. Upon the jurors failing to agree to impose the death penalty, the court sentenced the defendant to serve life imprisonment at hard labor without benefit of probation, parole or suspension of sentence pursuant to La.C.Cr.P. art. 905.8. Defendant appeals and assigns four errors.

DISCUSSION
Assignment of Error 1: The Court erred in denying defendant's Motion to Suppress statement which defendant asserted was made in violation of defendant's Miranda rights.
After the defendant and his companions surrendered to Houston police, Houston Police Department (HPD) Sergeant Ronnie Doyle took them into custody. On August 10, 1994, Sgt. Doyle read the defendant his Miranda rights. The defendant told him:
[T]hat he didn't want to talk to me about it, didn't havedidn't want to talk about it, didn't want to discuss it. I don't know exactly what words he used but words to that effect.
On August 11, Shreveport Police Department (SPD) Detectives Gary Robinson and William Offer came to Houston to interview the defendant. HPD Sgt. Doyle testified:
Q: Did you ever relate to the homicide detectives, namely Detective Robinson and Detective Offer, that Mr. Tolbert had informed you that he did not want to talk about the case?
A: I may haveI may have mentioned that he didn't want to talk to me about it.
Q: When you say you may have mentioned it, did you mention it?
A: Well, I mentioned the fact that he didn't want to talk to me about it.
And:
[W]hen I was talking to him personally, he just said he didn't want to talk about it, and I took it to mean he didn't want to talk to me about it since I'm notI didn't have any knowledge of it or anything.
Detective Offer brought the defendant into the interview room, where he and Detective Robinson set up audio and video equipment to record the defendant's statement, if any. Neither of these detectives testified that Sgt. Doyle told them that the defendant did not wish to speak to him.
Detectives Robinson and Offer read the defendant his rights per Miranda, and after the defendant indicated that he understood his rights, he proceeded to speak with the officers. A transcript of that interview is included in the record. After initially denying his involvement in the events, the defendant admitted that he shot Paul Liberto. However, the defendant denied shooting Wilma Liberto.
The defendant made another statement to the detectives on August 16, 1994, but that statement was not recorded.
On April 10, 1995, defendant filed a motion to suppress these statements. That motion alleged that the defendant was arrested without probable cause, that the statements were the product of, inter alia, duress, intimidation and illegal inducements, and that the defendant was not properly advised of and *954 did not understand his Miranda rights before making the statements.
The district court held a hearing on this motion. At this hearing, the court heard testimony from the Houston police officers who processed and spoke to the defendant as well as testimony from the Shreveport officers who contacted and interviewed the defendant thereafter. The court also saw and heard the defendant's statement on August 11, 1994. The audio was broken on the HPD video camera so the SPD officers simultaneously made an audio tape of the defendant's statement. All of the officers testified that the defendant was not threatened in any way and that no one made the defendant any promises in exchange for his statement. In particular, the court saw and heard tapes of SPD Detectives Robinson and Offer informing the defendant of his Miranda rights and determining that he understood these rights before beginning to question him.
On September 28, 1995, the district court denied the defendant's motion. In oral reasons for judgment, the court stated, inter alia:
I believe that the defendant did clearly and unequivocally waive his Miranda rights, and I believe that that is the conclusion that would be reached by anyone when listening to the tape and considering all of the evidence taken as a whole, that there has clearly, unequivocally been a waiver of those rights prior to the statement being made by the defendant in this instance.
At trial, the jury heard the audio tape of the defendant's statement.
On appeal, the defendant argues that the district court should have suppressed the August 11, 1994, statement he made to SPD Detectives Robinson and Offer because it was involuntary. Specifically, he complains that the SPD detectives should not have questioned him because he told HPD Sgt. Doyle that he did not wish to speak about the crime. Further, he complains that the SPD detectives informed him of his Miranda rights in a "convoluted" manner and then "continued to harangue" him until he made a statement.
La. R.S. 15:451 provides:
Before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.
La. C.E. art. 703(D) provides:
D. On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.
Because the credibility of witnesses plays a key role in the determination of voluntariness, a reviewing court will defer to the ruling of the trial court in such matters unless that ruling is inadequately supported by reliable evidence. State v. Seals, 95-0305 (La. 11/25/96), 684 So.2d 368, 380, cert. denied ___ U.S. ___, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Green, 94-0887 (La.05/22/95), 655 So.2d 272, 281; State v. Thomas, 28,790 (La.App. 2d Cir.10/30/96), 683 So.2d 1272, 1278, writ denied 96-2844 (La.04/25/97), 692 So.2d 1081.

Waiver of the Privilege Against Self-Incrimination
When a defendant invokes his constitutional right to silence, the validity of any subsequent waiver depends upon the "scrupulous honoring" of that right by the police. Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). Whether an accused's rights are "scrupulously honored" depends on the totality of the circumstances involved under the particular facts of each case. One factor to be considered is who initiates the further questioning. Other factors include "the time delay between the original request and subsequent interrogation, whether Miranda warnings were given before each separate interrogation, whether waiver of rights forms were signed, and whether or not pressures were asserted on the accused by the police between the time he invoked his right ... and the subsequent interrogation." State v. *955 Brooks, 505 So.2d 714, 722 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987); State v. Harper, 430 So.2d 627, 633 (La.1983). See also State v. Stacy, 27,136 (La.App. 2d Cir.10/05/95), 665 So.2d 390, 397-398, reversed on other grounds 96-0221 (La.10/15/96), 680 So.2d 1175, opinion after remand 27,136 (La.App. 2d Cir.12/20/96), 686 So.2d 949.
The evidence of the defendant's invocation of his right to silence, if his actions can be so characterized, was equivocal. HPD Sgt. Doyle testified at the hearing that after hearing the Miranda warnings, the defendant said that "he had nothing to tell me." Doyle said that he "mentioned" to the SPD detectives that the defendant didn't want to talk to him about the crime, and the officer testified that the defendant did not expound upon his wish not to speak about the crime. Sgt. Doyle said that he interpreted the defendant's refusal to speak to him not as a general refusal to make a statement but as a specific refusal to speak to him personally because "I didn't have any knowledge of it or anything."
SPD detectives met with the defendant the next day. Before the detectives questioned the defendant, they again read him the Miranda warnings and the defendant signed the card signifying that officers had given him these warnings. All of the officers involved testified that the defendant had not been threatened or mistreated at any time during his custody. After hearing his rights, the defendant decided to make a statement.
In light of this evidence, the defendant has not shown that the trial court erred by admitting his statement despite his Mosley complaint. Most significant is the uncertain scope of the defendant's initial silence. The SPD officers were made aware that the defendant had refused to make a statement to HPD Sgt. Doyle but there is no evidence that the defendant intended this silence as a blanket refusal to speak to police. The only evidence about the scope of the defendant's silence suggested that his refusal to speak was specific to HPD because the Texas agency had nothing to do with the investigation. Before questioning Tolbert, SPD officers repeatedly informed the defendant that he did not have to make a statement. The entirety of the discussion between Tolbert and the SPD detectives was recorded, and Tolbert gave no indication to those officers that he wished to remain silent. Finally, Tolbert spoke to SPD detectives a day after refusing to speak to HPD Sgt. Doyle-not so close in time as to suggest coercion or badgering.
Because the defendant's refusal to speak with HPD Sgt. Doyle was ambiguous and because his subsequent statement was not the product of coercion, the trial court correctly found that the defendant's right to remain silent was scrupulously honored and his argument to the contrary is without merit.

Voluntary Character of Statement
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rehearing denied, 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966), the United States Supreme Court declared that a condition precedent to obtaining a statement admissible in court from a suspect in police custody is that the suspect be informed that he has the right to remain silent and to consult with an attorney. Miranda also made it clear that for such a statement to be admissible it must be made with a knowing and intelligent waiver of those rights. Miranda, supra, at 384 U.S. 475, 86 S.Ct. at 1602; State v. Green, supra, at 280.
Even when a defendant has not expressly invoked his rights under Miranda, "[t]he courts must presume that a defendant did not waive his rights." North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). Furthermore, it is well-settled that a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Tague v. Louisiana, 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980); Green, supra. The waiver of Miranda rights need not be explicit and may be inferred from the circumstances surrounding the statement. However, a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact *956 that an inculpatory statement was eventually obtained. State v. Fowlkes, 25,870 (La.App. 2d Cir.03/30/94), 634 So.2d 953, 957.
It is undisputed that SPD officers read the defendant the Miranda warnings before taking his statement. However, the defendant complains that the officers read him the warnings in a convoluted way calculated to induce the defendant to make a statement. The warnings were given as follows:
Robinson: ... Before we can talk to you, or even if you want to talk to us I have to read you your rights to you. Calvin, will you read along with me, it says "You're under arrest for your part in the offense of first degree murder and attempted first degree murder in connection with the homicide / robbery of the Wilma Liberto and also Paul Liberto," let me finish please. You know the store I'm talking about, OK. The one on 1957 Weinstock, that's what you've been arrested for and that's what you've been identified. It says "You're under arrest for your part in" the offense I just read to you, first degree murder and attempted first degree murder. By the way, this offense occurred on August the 1st at approximately 13:23 hours. Anyway, I hereby notify you that you have a right to remain silent. You are not required to make any statement unless you want to do so voluntarily. Anything you say will be used against you in a court of law. You also have the right to consult with your attorney and to have him present with you. If you cannot afford an attorney, one will be appointed to represent you. Do you understand your rights, Calvin?
Defendant: Yes.
Robinson: Put your initials on the bottom of that card for me saying I read your rights to you. Let's try this one and see how it works. Kind of lean it to the side maybe.
Defendant: (Inaudible)
Robinson: (Inaudible)
Offer: (Inaudible)
Robinson: Just leave it there, OK. Turn your card over if you would please. And on the back of that card it says Calvin, while you're not required to make any statement, you may waive those rights I just explained to you. Of course, you are given the privilege of saying anything you want about this case. Now with this understanding and waiving those rights just explained to you, do you wish to make a statement and tell how this happened? In other words do you understand your rights Calvin?
Defendant: Yes, sir.
Robinson: Do you understand that you do not have to talk or answer any questions Detective Offer and I have for you?
Defendant: Yes, sir.
Robinson: Ok. Do you wish to answer our questions? Or will you make a statement answer our questions?
Defendant: (Inaudible)
Offer: You gonna give us a statement Calvin? Are you gonna give us a statement?
Robinson: You'll give us a statement? Will you give us a statement? Do you realize during that statement if you feel like you need an attorney or something you can stop and ask for an attorney?
Defendant: Yes.
Robinson: Ok. What I want you to do is date it 8-11-94 and then sign your name.
Offer: You know we're from Shreveport, right Calvin? We're Shreveport Police officers, you know that?
Defendant: Yeah.
Offer: OK.
Robinson: OK.
Offer: We've come all the way to Shreveport here to talk to you. OK. We're not Houston, we're, we're Shreveport police....
Detective Offer then confronted the defendant with the videotape of the crime, and the defendant began to answer questions.
Although the defendant accurately observes that some of the officers' questions were compound in nature, that characteristic is insufficient to override the trial court's finding that the defendant voluntarily spoke to the detectives. The detectives testified that the overall tenor of the defendant's responses, *957 both verbal and non-verbal, indicated that he wanted to make a statement.
In making its decision, the district court had not only the benefit of the testimony of the investigating officers and a transcript of the statement, it also had an audio and video tape recording of the officers informing the defendant of his rights and of the defendant choosing to make a statement. The audio tape of the statement played a significant role in the court's determination; as noted above, the court expressed its belief that "anyone" listening to the tape would conclude that the defendant waived his rights and that his statement was voluntary.
As both the transcript and the tapes demonstrate, the defendant was willing to make a statement to SPD detectives even after they repeatedly informed him that he did not have to do so. There is no evidence that the officers "badgered" the defendant into speaking or exercised any improper influence whatever.
The defendant has failed to show that the trial court's ruling on his motion to suppress his statement was incorrect. Accordingly, this assignment of error is without merit.
Assignment of Error 2: The Court erred in denying defendant's Motion to Suppress identification which defendant asserted was unduly suggestive and lacked independent basis.
The defendant filed a pre-trial motion to suppress identification evidence. That motion did not specify any particular witness or identification but asserted that all of the identifications of the defendant were unreliable for several reasons.
The trial court held a hearing on this motion. Three witnesses, Roberto Gilyard, Jacoby Dickson and Jarod Dickson, testified about the circumstances under which they identified the defendant. After hearing their testimony, the court denied the defendant's motion. The court found that the identifications were not made under unduly suggestive circumstances and that the witnesses had an independent basis for their identifications. At trial, each of these witnesses identified the defendant as a participant in the robbery. Only the identifications made by the Dicksons are challenged on appeal.

Jacoby Dickson
Jacoby Dickson made his pretrial identification of the defendant from the surveillance videotape of the robbery. The defendant argued that police suggested to Dickson that the defendant was involved and that this suggestion, not the witness' knowledge of the defendant, was the basis for the identification.
Jacoby Dickson, Jarod Dickson's brother, said that he was at home asleep at the time of the robbery. After the robbery, Jacoby spoke to Antoine Holmes, who told him that Mrs. Liberto had been shot. Dickson went down to the corner and saw that the neighborhood was "full of police." Police questioned Dickson about who might have done the shooting, but Dickson said he told them that he did not know.
Later that afternoon, police came to the Dickson's house to speak to Jarod. Police questioned Jarod and later spoke to Jacoby. Police took Jarod Dickson and Antoine Holmes to the scene of the crime, and Jacoby and a group of others followed them. Police again began to question a group of persons, including Jacoby Dickson. They asked about gang activity in the neighborhood, and in particular asked about the defendant. Jacoby testified that police both asked and told him about things that the defendant had done in the past.
Eventually police asked Jacoby Dickson to come to the station to answer further questions. Once Dickson arrived at the station, police asked him to view the surveillance videotape, which he did.
Jacoby Dickson testified that he had known the defendant for "a couple of years" prior to the robbery and saw him "just about every day." Dickson testified that he could clearly see the defendant, Randall, and Rushing on the tape, and that he identified these men on his first viewing of the tape. The witness said that police did not suggest to him who he would see on the tape and that they did not threaten him in any way.

*958 Jarod Dickson

Jarod Dickson, a participant in this crime who entered Liberto's Grocery just after the defendant left, told police that the defendant was one of the 3 who first robbed the store. Before he was arrested, Jarod Dickson showed police the defendant's picture in a school yearbook. After he was arrested, Dickson identified the defendant on the surveillance video. Dickson said that he knew the defendant for some time before the crime and that he saw Tolbert "every other day."
With regard to these witnesses, the defendant complains that their identifications of him before and during trial were unreliable because police tainted the process by using suggestive procedures. This complaint is not only unsupported by the evidence, it ignores entirely the overwhelming array of identification evidence apart from these witness' testimony.
To suppress an identification, the defendant must prove the procedure involved to be suggestive and that the totality of circumstances presented a substantial likelihood of misidentification. State v. Martin, 595 So.2d 592 (La.1992); State v. Davis, 27,961 (La.App. 2d Cir.04/08/96), 672 So.2d 428. In evaluating whether the reliability of an identification may outweigh the suggestiveness of the employed procedures, the court is directed to look at several factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).
As both of the Dickson's testified, they knew the defendant personally from routine encounters well before these events took place. Consequently, these witnesses were well acquainted with the defendant's appearance. This independent knowledge renders de minimis the effect of the allegedly suggestive procedures used by police. Moreover, Jarod Dickson was a co-perpetrator of this offense; it is highly unlikely that he misidentified the defendant that he saw moments before and after the robbery.
Finally, the testimony of several other witnesses and the surveillance videotape proved that the defendant was the person who committed this crime. Jimmy Smith, LaTonya Dillard, Michael Gilyard, and Roberto Gilyard positively identified the defendant as one of the three men fleeing from the store. The videotape and the testimony of Antoine Holmes, Sancho Rushing, and Marcus Randall conclusively established that the defendant was the man in the Houston Astro's cap who shot both of the Libertos. The defendant admitted to robbing the store and to shooting Paul Liberto. There was no likelihood of misidentification. Compare State v. Davis, 92-1623 (La.05/23/94), 637 So.2d 1012, 1022-1023, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1995).
Because the witnesses made valid identifications of the defendant and because there was no question that the defendant was the perpetrator of the offense, this assignment of error is without merit.
Assignment of Error 3: The Court erred in overruling defendant's objection to multiple showing to jury of video tape film alleged showing defendant engaged in criminal act on the basis of its undue prejudicial effect on the jury.
Although this assignment of error refers only to the surveillance videotape, defendant additionally complains in brief of the introduction into evidence of a crime scene videotape and of a photo of Wilma Liberto's face showing the gunshot wound. The defendant objected to these items of evidence as they were introduced.

Surveillance Videotape
During the testimony of Randle, Rushing, Holmes and the Dicksons, the state played the black and white surveillance videotape for the jury. The defendant did not object to the first showing but objected to subsequent showings on the ground that the cumulative effect of the videotape evidence would be unduly prejudicial. The state argued that multiple viewings of the tape were necessary because the events depicted occurred so quickly and that only through repetition *959 could the jury see which of the robbers fired which shots. The judge agreed and allowed the multiple viewings.
On appeal, defendant complains that the jury was unfairly prejudiced against him by the multiple viewings. This complaint falls within the ambit of La. C.E. art. 403, which provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
The trial court is entitled to great latitude in deciding whether evidence is more probative than prejudicial. State v. Martin, 29,352 (La.App. 2d Cir.05/13/97), 694 So.2d 1209, 1215.
No evidence of a crime is more probative than a film or videotape of the offense and exclusion of such evidence on grounds that it is more prejudicial than probative requires an extraordinary showing of prejudice. Here, the complaint is not that the tape should have been excluded entirely, but rather that repetition of the tape inflamed the jury while failing to enlighten them.
As noted, the defendant made no demand and gave the Libertos no warning before shooting them. Further, the defendant stood close to both victims as he shot them. For those reasons, the event begins suddenly and finishes quickly-in a matter of a few seconds. The defendant's theory of the case was that he only shot Paul Liberto while Randall shot Wilma Liberto. It would be difficult or impossible for a juror to view the tape only once and then make a determination about which person took what action; multiple viewings were simply required in order for the jurors to glean sufficient information from the tape.
This is not to discount the brutal and shocking nature of this crime as depicted on the video. Without a word, almost casually, the defendant quickly shot two people at close range to further his robbery scheme. The defendant's specific intent to kill both victims cannot be disputed, and viewing this scene as it happened is chilling. Certainly the videotape evidence had some inflammatory and prejudicial effect on the jury. Nevertheless, the prejudice that inheres from such evidence is not an unfair prejudice because the defendant himself created the scene he later sought to obfuscate for the jury. The state is entitled to the moral force of its evidence. State v. Koon, 96-1208 (La.05/20/97), 704 So.2d 756, 776, cert. denied ___ U.S. ___, 118 S.Ct. 570, ___ L.Ed.2d ___ (1997).
This argument is without merit.

Crime Scene Video and Postmortem Photograph
Postmortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location, placement of wounds, as well as to provide positive identification of the victim. State v. Koon, supra; State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 532, n. 8; State v. Watson, 449 So.2d 1321, 1326 (La.1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985); State v. Kirkpatrick, 443 So.2d 546, 554-555 (La.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984). Photographic evidence will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Perry, 502 So.2d 543, 558-559 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987).
The crime scene video in question is a color videotape taken from various locations both in and outside of the Libertos' store. As the state points out, the crime scene video corroborates testimony regarding the position of Wilma Liberto's body, her identity as the victim, the location of spent cartridge cases, and the bullet hole in the counter. Further, the viewer gets a much clearer picture of the layout of the Libertos' store from this video than from the surveillance video, which was fixed in position and in black and white.
The postmortem photo is a closeup color view of the bullet wound to Wilma Liberto's face. The coroner, Dr. George McCormick, used this photo to show how Mrs. Liberto *960 died from drowning in her own blood. The photo dramatically illustrates the location of the wound, a matter relevant to the defendant's specific intent to kill, and, in conjunction with the coroner's testimony, shows the trajectory of the bullet, a matter relevant to the issue of who fired the fatal shot.
Each of these pieces of evidence had relevance and significant probative value for questions at issue at trial. Neither the video or the photograph is so gruesome as to overwhelm the jurors' reason.
For these reasons, this assignment of error is without merit.
Assignment of Error 4: The Court erred in failing to grant defendant's Motion for Mistrial based on State's undue appeal to jurors' emotions in closing argument in penalty phase of proceeding.
Although this assignment of error refers to the penalty phase of this trial, the complained-of remarks were made during the guilt phase. During closing argument, the prosecutor made two references to the victim's suffering prior to her death:
When that gun goes off, [Wilma Liberto's] body flies back in the position that you saw in the crime scene video when the police got there. In the position that you see where she ends up. When the gunwhen the bullet fired from his gun smacks her in the chin and drives her into that corner, and you heard Dr. McCormick say, unfortunately for Mrs. Liberto, she didn't die then. The bullet didn't go in her brain. It went in her chin. So she had the pain of laying there on the ground with this horrible wound to her face, and she's still alive. She's still living. The last moments of her life are still there, and she's drowning in her own blood. Just think about when you cut your mouth, and you taste your own blood sometimes, like when you're brushing your teeth maybe, or go to the dentist. Just imagine drowning in that taste. Just imagine what that's like. Then, think about him on that video shooting that poor old lady in the face, and what for?
Further, the prosecutor argued:
But we do know from Dr. McCormick's testimony, and from Mr. Beighley's testimony that only one bullet came from Mrs. Liberto from this incident, and itit's the bullet that he dug out of her body at the autopsy. Her body had to be submitted to that. She didn't get to lay inshe didn't get what somebody should be able to get, death with dignity. Death with dignity. Something everybody should have. Something Mr. Calvin Tolbert should have. She didn't have it. You need to think about what that means, about being killed and you don't get to die in the hospital of your old age. You don't get to die with your family and friends, being able to say goodbye to them. You die at a store after somebody shot a gun in your face. Your dead body is laying out there as you're drowning in your own blood, and the police have to come in and film, and then we have to show it to the jury in a courtroom to prove to everybody we're saying what the allegations are. Think about what that means when you're trying to decide what to do in this case.
During portions of this argument, the prosecutor was moved to tears.
Defense counsel did not object to these argument or to the prosecutor's conduct while argument was underway. However, after closing arguments were complete, and after the court had taken a recess, the defendant raised an objection and moved for a mistrial. The prosecutor argued that his conduct was "an honest, emotional response that just came on during the closing arguments, and it's just something that happens." The prosecutor also noted that the defendant did not object to the argument while it was underway. The trial court denied the defendant's motion.
On appeal, the defendant argues that the prosecutor's description of Mrs. Liberto's death combined with his emotional reaction created "[inestimable] potential for undone prejudice in [this] capital murder case ..." and required a mistrial. The state argues that the argument was not so improper as to require a mistrial and that the overwhelming evidence of the defendant's guilt negated any possibility of prejudice.
La.C.Cr.P. art. 841 provides, in pertinent part:

*961 A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
In State v. Spencer, 93-571 (La.App. 5th Cir.01/25/94), 631 So.2d 1363, writ denied 94-0488 (La.2/3/95), 649 So.2d 400, the fifth circuit ruled untimely a defense objection to the state's argument and request for a mistrial made after arguments were complete but before the jury was instructed. In State v. Francis, 95-194 (La.App. 5th Cir. 11/28/95), 665 So.2d 596, 603, that same court indicated in dicta that an objection made during or after argument would be timely.
In State v. Baker, 28,152 (La.App. 2d Cir.05/08/96), 674 So.2d 1108, 1115, writ denied 96-1909 (La.12/06/96), 684 So.2d 925, this court considered a situation where a defendant complained on the record of a prosecutor's allegedly improper argument after argument was concluded and after the jury was charged and sent to deliberate. As the trial court decided at the time, this court elected to consider the defendant's complaint as a motion for mistrial.
In this case, the defendant raised his objection to the allegedly improper argument after the arguments were complete but before the court charged the jury. The defendant did not request an admonition, however, he requested a mistrial.
Under these circumstances, the defendant's motion for mistrial was timely. Although closing arguments were complete, the court had the opportunity to either grant a mistrial pursuant to La.C.Cr.P. art. 775 or to offer sua sponte the remedies outlined in La.C.Cr.P. art. 771 if the court believed those remedies to be appropriate. Indeed, this situation is easier for the trial court to correct than the situation in Baker because the jury instructions had yet to be given. Accordingly, the defendant's assignment will be considered.
La.C.Cr.P. art. 774 provides, in pertinent part:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
In State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, 1285-1286, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996), the supreme court said:
This court has stated as a general matter that a prosecutor retains considerable latitude in making closing arguments. State v. Byrne, 483 So.2d 564 (La.1986), cert. denied, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); State v. Morris, 404 So.2d 1186 (La.1981). Even when it has found that a prosecutor has exceeded that latitude, the court has often criticized the improper arguments without finding that they constitute reversible error. See, e.g., Byrne, supra; State v. Jarman, 445 So.2d 1184 (La.1984); State v. Messer, 408 So.2d 1354 (La.1982). Specifically, this court will not overturn a guilty verdict on the basis of improper argument unless "firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict." Byrne, 483 So.2d at 572; Messer, 408 So.2d at 1357.
Although generally supported by the evidence, the prosecutor's comments about the death throes of Mrs. Liberto were not relevant to the defendant's guilt or innocence and risked being a mere appeal to prejudice. Nevertheless, the overwhelming evidence of the defendant's guilt renders these comments harmless. The evidence demonstrated to the jury that the defendant entered the store with a specific intent to kill, that he shot both of the Libertos, and that Mrs. Liberto died as a result of her injury. Even if, as the defendant argues, he did not shoot Mrs. Liberto, he would still be guilty of first-degree murder as a principal because of the evidence of his specific intent to kill during this robbery and murder. As Marcus Randall testified and as the defendant's actions demonstrated, the defendant was "down with" *962 the plan to "leave no witnesses" to the robbery. See State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 931; State v. Brooks, supra, 505 So.2d at 717.
This assignment of error is without merit.

ERROR PATENT
At sentencing, the trial judge informed the defendant that he had "three years to pursue... post-conviction relief...." This is a common error. The three year prescriptive period does not begin to run until the judgment is final under La.C.Cr. P. art. 914 or 922; thus, prescription has not yet begun to run. State v. Mock, 602 So.2d 776 (La.App. 2d Cir.1992). Within 10 days of the rendition of this opinion, we direct the district court to send appropriate written notice to the defendant and file proof of defendant's receipt of such notice in the record of the proceedings. State v. Mock, supra; State v. Smith, 600 So.2d 745 (La.App. 2d Cir.1992). No other errors patent were noted.

CONCLUSION
For the above reasons, we affirm the defendant's conviction and sentence.
AFFIRMED.