763 So.2d 791 (2000)
STATE of Louisiana, Appellee,
v.
Almetric DEBROW, Appellant.
No. 33,592-KA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 2000.
*793 Amy C. Ellender, Louisiana Appellate Project, Counsel for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Ross Owen and Tommy J. Johnson, Assistant District Attorneys, Counsel for Appellee.
Before WILLIAMS, GASKINS and CRIGLER (Pro Tempore), JJ.
CRIGLER, Judge Pro Tempore.
Almetric Debrow and codefendant Tarence Mitchell were charged by bill of information with two counts each of attempted armed robbery. A 12-member jury found Debrow guilty as charged.[1] The State then charged him as a third felony offender; after adjudication, the District Court sentenced Debrow to concurrent sentences of life in prison without benefit of parole, probation or suspension of sentence, and 35 years at hard labor without benefit. Debrow now appeals, urging three assignments of error. We affirm.

Factual background
The charges arise from a foiled armed robbery at Consumer's Grocery on Pierre Avenue in Shreveport. On the evening of April 1, 1997, two employees, Johnny Smith and Charles Maranto, were working at the store. An off-duty Shreveport Police Officer, Guy Smith, was working a security detail there; from the store's office, he could see the surveillance video monitor. Between 10:00 and 11:00 PM, three men entered the store.
One of the men, identified as Louis Bonner, walked behind the counter and pulled a gun on Johnny Smith. Johnny Smith backed toward the office door while Officer Smith, who could see the unfolding situation on the monitor, unholstered his gun. Bonner forced Johnny Smith into the office and then ordered Officer Smith to drop his weapon. Officer Smith, however, slapped Bonner's arm away and then fired two shots at Bonner with his .40 cal. Glock revolver. Bonner fell to the floor and shouted, "OK man, you got me." Officer Smith kicked the gun out of his hand and ran out of the office.
Simultaneously the second suspect, later identified as Debrow, went to the other end of the counter. He pulled a gun on Maranto, who was working the cash register, and demanded money. Maranto testified that he was opening the cash drawer when he heard the two shots from the office. Maranto did not get a good look at his assailant's face; as soon as the shots rang out, Debrow fled.
Officer Smith testified that after he came out of the office and saw that Maranto was unharmed, he noticed the third suspect, later identified as Tarence Mitchell, crouched and hurriedly walking toward the exit. Officer Smith was momentarily delayed in his pursuit because the small door to the counter area was locked. By the time he got outside, the two remaining suspects had fled, but several persons milling *794 around the storefront pointed down Poland Street. Officer Smith ran that way and saw the third suspect, Mitchell, running towards a beige Cadillac that was rolling slowly down the street with its lights off. Officer Smith testified that he saw the glint of a gun from the driver's door and heard a shot; he fired five rounds at the Cadillac. Mitchell hopped in the back seat and the Cadillac drove away.
Neither Maranto, Johnny Smith nor Officer Smith could identify any of the suspects. However, most of the action inside the store was captured on the surveillance videotape. The video was crucial in identifying the defendants.
The first suspect, Bonner, died from his gunshot wounds. Detective Tony Rei, who investigated the incident, contacted Bonner's next of kin, through whom he developed Mitchell as a suspect. He was arrested on April 2. Mitchell admitted that he was in the store at the time of the incident and that he fled after he heard the shooting, but he insisted that he was not involved.
Another of Bonner's relatives sent Rei on a series of leads that resulted in the arrest of one of Bonner's friends, Xavier Kinsey. Insisting he was not involved, Kinsey directed police to Peter Davis and Connie Martin. Davis picked Debrow out of a photo lineup, identifying him by his nickname, "Fatty," as well as Mitchell, who went by "Wally Wally." Viewing the video, he identified "Fatty" as the suspect who held the gun on the cashier. Connie Martin testified that she was in the store when Bonner and his two friends came in; she left before the incident erupted. She identified, from the same photo lineups, Debrow and Mitchell as the two guys who came in with Bonner that night. She did not view the video. As a result of the information from Davis and Ms. Martin, Kinsey was released. Debrow was arrested on May 3; he gave no statement to police.
As noted, both Debrow and Mitchell were charged on the same bill of information with two counts of attempted armed robbery.[2] The matter proceeded to jury trial in February 1999. The State's case was essentially that summarized above. The defendants did not deny that an attempted armed robbery occurred; the thrust of their respective defenses was inadequate identification. Both victims admitted at trial that they did not get a good look at their assailants and could not describe them. Maranto, in fact, testified that only two men had entered the store. Officer Smith was also unable to describe or identify the suspects, although he did generally describe their clothing and the getaway car. However, he testified that after viewing the video, he felt that the second suspectthe one at the cash registerwas Debrow.
The defendants also attempted to impeach Peter Davis, who identified Debrow and Mitchell both in photo lineups and on the surveillance video. This effort was based on alleged inconsistencies between his trial testimony and his statements to Detective Rei, and three witnesses who contradicted various parts of his testimony. Mitchell's fiancée, Jacqueline Bell, testified that Mitchell was with her at her father's home watching TV on the evening of the incident; he left for roughly one hour to buy some cigarettes, and returned saying there was a "conflict" while he was at the store. She insisted that Mitchell was not involved, but admitted she saw him on the video; also, he told her he ducked and ran when he heard the gunshots, and that a police officer fired at him in the street.
The defendants also objected to the replaying of the surveillance video, which was shown four times during the presentation of evidence and again during the State's closing. The District Court initially sustained the objection on grounds of improper foundation, but later overruled *795 objections that the tape was inflammatory and prejudicial.
By an 11-1 vote, the jury found Debrow guilty as charged. He was then adjudicated a third felony offender. At the sentencing hearing, Debrow protested his innocence. As noted, the court imposed concurrent sentences of life and 35 years at hard labor, all without benefit.

Discussion: Sufficiency of evidence
By his first assignment Debrow urges the evidence is insufficient to sustain the convictions. He concedes that an attempted armed robbery occurred, but contends the evidence does not connect him with the crime or identify him as one of the perpetrators. In support he argues that neither victim, Maranto nor Johnny Smith, could identify any of the assailants; and that the security guard, Officer Smith, positively identified only Bonner, failed to mention Debrow in his statement to Detective Rei, and only ambiguously testified that he saw Debrow enter the store. He further argues that neither of the identification witnesses, Peter Davis nor Connie Martin, was present when the offense occurred: Ms. Martin only saw Debrow enter the store with Bonner and Mitchell, did not see the robbery, and did not identify them from photo lineups until three weeks after the incident; and Davis was utterly unbelievable because of impeachment evidence. Finally, Debrow cites the absence of fingerprints, weapons, or other physical evidence, and suggests that witnesses may have confused him with Xavier Kinsey, who was an early suspect in the case and bears a close resemblance to Debrow.
When the defendant challenges both the sufficiency of the evidence and other trial errors, the reviewing court first determines the sufficiency issue, as the defendant may be entitled to acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably find every element of the offense beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992). The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or part; thus, a reviewing court may impinge on the fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law. La. Const. art. 5 § 10(B); State v. Mussall, 523 So.2d 1305 (La.1988). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for the factual conclusion. State v. Greenwell, 32,249 (La. App. 2 Cir. 8/18/99), 746 So.2d 29, and citations therein.
When the conviction is based on circumstantial evidence, La. R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. State v. Casey, 99-0023 (La.1/26/00), ___ So.2d ___, 2000 WL 101212. However, R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula. Id.; State v. Porretto, 468 So.2d 1142 (La. 1985).
When the defendant claims he was not the person who committed the crime, or he remains silent, the Jackson rationale requires the State to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Brady, 414 So.2d 364 (La.1982); State v. Baker, 28,152 (La.App. 2 Cir. 5/8/96), 674 So.2d 1108, writ denied 96-1909 (La.12/6/96), 684 So.2d 925. Positive identification by only one witness may be sufficient to support a defendant's conviction. State v. Davis, 27,961 (La.App. 2 Cir. 4/8/96), 672 So.2d 428, writ denied 97-0383 (La.10/31/97), 703 So.2d 12; State v. Miller, 561 So.2d 892 (La.App. 2 Cir.), writ denied 566 So.2d 983 (1990).
*796 The first prong of Debrow's argument is that identification failed because nobody present at the time of the offense could identify him. This is accurate with respect to the victims. However, Officer Smith testified that the second man to enter the store was Debrow. Admittedly, Officer Smith did not recognize him at first sight, but did so after viewing the video. Also, Officer Smith was slightly equivocal on cross examination about whether he referred to Debrow or Mitchell as "Man # 2"or "Suspect # 2." While Officer Smith's testimony could have been more lucid, it does not present the kind of internal inconsistency or conflict with other evidence that would warrant rejecting it. The jury did not abuse its discretion by accepting Officer Smith's testimony.
The major thrust of the State's case, of course, was by identification witnesses who were not present for the offense but picked Debrow from photo lineups or recognized him on the surveillance video. Debrow urges that the testimony of Connie Martin and Peter Davis should be subjected to the rules of eyewitness identification set forth in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); see also State v. Prudholm, 446 So.2d 729 (La.1984).[3] Strictly speaking, the Manson factors are applicable only to cases involving eyewitness identification. See State v. Rattler, 503 So.2d 168 (La.App. 4 Cir.), writs denied 507 So.2d 224 (1987). Ms. Martin was not a witness to the crime, but she provided important circumstantial evidence that the three assailants entered the store together just before it occurred. She testified that Bonner was her daughter's cousin and she did not know him very well, yet she recognized him when he came in. Three weeks after the incident, she selected Debrow and Mitchell from photo lineups. Nothing in her direct or cross examination suggests that she lacked the opportunity to see Bonner's companions, that she gave any prior inconsistent identification, or that she lacked certainty. There is no contention that the photo lineup was unduly suggestive. On this record, the jury could rationally accept her testimony that Debrow entered the store moments before the attempted robbery.
Peter Davis was not an eyewitness. He recognized Debrow and Mitchell by selecting their photos from the lineups, and later identified both of them in the video. He also testified that both men stopped by his house shortly after the crime. His testimony, if accepted by the jury, would plainly incriminate Debrow in the crime. In brief, Debrow has catalogued Davis's credibility problems. Davis testified that Mitchell and his girlfriend, Jacqueline Bell, lived with him at his house on March Street for about three weeks, during which time the crime occurred; Ms. Bell flatly denied they had ever lived with Davis. Davis claimed that he was employed at Buckhalter Recovery Center and had also done counseling at the Caddo Juvenile Detention Center; however, witnesses from both of those institutions testified they had no recollection that Davis had ever worked for them, and were unable to find him in their employment records. Finally, Davis is recorded in Detective Rei's narrative supplement as saying that Xavier Kinsey was a "big time rock dealer" who sold crack off his back porch; however, at trial he denied ever saying this to Rei. Davis also admitted that he had done crack and that only after officers began investigating him for the crime did he name Debrow.
While Davis's testimony is not free of difficulty, we must view it in the light most *797 favorable to the State. Jackson v. Virginia, supra. The inconsistencies do not really undermine his ability to identify Debrow in the lineup and video. Whether he had the motive to accuse Debrow falsely of the crime was a credibility issue for the jury. On this record we simply cannot say that the jury should have completely rejected Davis's testimony.
The final prong of Debrow's argument is that the identification is flawed because an early suspect, Xavier Kinsey, looks a lot like Debrow and the State did not negate the reasonable probability of misidentification. In support, Debrow cites Detective Rei's testimony that according to Kinsey's mother, Kinsey is often mistaken for Debrow; he also contends that Kinsey was released as a suspect on the flimsy excuse that his girlfriend corroborated his alibi. This record, however, is devoid of evidence to suggest that the State improperly released any suspects. Moreover, the evidence suggesting that somebody else who looked like Debrow might have committed the offense simply does not create reasonable doubt.
This assignment of error lacks merit.

Use of surveillance videotape
By his second assignment Debrow urges the District Court erred in admitting the video surveillance tape, in allowing it to be played repeatedly during trial, and in permitting witnesses to identify suspects from the tape. He argues the tape was unduly prejudicial under La. C.E. art. 403 because it allowed Detective Rei and Peter Davis, who did not witness the incident, to identify the suspects; even if the tape was admissible, he argues that multiple replaying was an abuse of discretion. He also asserts that the tape itself was the best evidence of its contents under La. C.E. art. 1004, so commentary in the form of witness identification was inadmissible extrinsic evidence.
Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403. Surveillance films and videotapes have long been admissible as relevant evidence. See, State v. Lacoste, 256 La. 697, 237 So.2d 871 (1970); State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). In fact, this court recently stated:
No evidence of a crime is more probative than a film or videotape of the offense and the exclusion of such evidence on grounds that it is more prejudicial than probative requires an extraordinary showing of prejudice.

State v. Tolbert, 30,821 (La.App. 2 Cir. 8/19/98), 716 So.2d 949, writ denied 98-2562 (La.1/15/99), 736 So.2d 207.
Here, Debrow has not made the requisite extraordinary showing. The distinct value of surveillance videotape is to facilitate the identification and apprehension of suspects. The mere fact that the tape allows third parties to identify a suspect does not make it unduly prejudicial. This argument lacks merit.
Debrow next urges that even if the tape was admissible, the repeated playing was inflammatory and prejudicial. However, we addressed the same argument in State v. Tolbert, supra, and concluded:
Here, the complaint is not that the tape should have been excluded entirely, but rather that repetition of the tape inflamed the jury while failing to enlighten them.
As noted, the defendant made no demand and gave [the victims] no warning before shooting them. Further, the defendant stood close to both victims as he *798 shot them. For these reasons, the event begins suddenly and finishes quicklyin a matter of a few seconds. * * *It would be difficult or impossible for a juror to view the tape only once and then make a determination about which person took what action; multiple viewings were simply required in order for the jurors to glean sufficient information from the tape. Id., at 18, 716 So.2d at 959.
The same rationale applies here. Given the swift sequence of events and the need for accurate identification, the District Court was entitled to permit multiple playing of the videotape.
Finally, Debrow urges that because the videotape itself was the best evidence of its contents, the testimony identifying him as a perpetrator was inadmissible extrinsic evidence. Other evidence of the contents of a writing, recording, or photograph is admissible if all originals have been lost or destroyed, or no original can be obtained by any available judicial process or procedure. La. C.E. art. 1004(1) and (2).[4] However, if a witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are: (1) Rationally based on the perception of the witness; and (2) Helpful to a clear understanding of his testimony or the determination of a fact in issue. La. C.E. art. 701. The courts have routinely allowed witnesses to comment on the contents of a film or videotape if the testimony helps explain it. State v. Lacoste, supra; State v. Davis, supra; State v. Tolbert, supra. We perceive no abuse of the District Court's discretion.
This assignment lacks merit.

Excessive sentence
By his third assignment Debrow urges the District Court failed to comply with the guidelines of La.C.Cr.P. art. 894.1 and imposed constitutionally excessive sentences of life and 35 years at hard labor without benefit. Pointing out that the court failed to enunciate any reasons for the sentences, he submits that the only justification was his criminal history as a third felony offender, La. R.S. 15:529.1. Finally, he argues that his sentences are disproportionate to the 3½ year sentences, with benefit, meted to his codefendant Tarence Mitchell.
At the outset we note that Debrow filed a motion to reconsider sentence only on the general grounds that the sentence is excessive, unconstitutional, and an abuse of discretion. Only issues raised by motion in the trial court may be asserted as grounds on appeal. La.C.Cr.P. art. 881.1. Since Debrow's motion urged only constitutional excessiveness, that is the only issue we may address on appeal. State v. Mims, 619 So.2d 1059 (La.1993); State v. Mitchell, 26,070 (La.App. 2 Cir. 6/22/94), 639 So.2d 391, writ denied 94-1981 (La.12/16/94), 648 So.2d 387. We note parenthetically that the District Court ordered a presentence investigation report which confirms the court's finding of a "significant and lengthy prior criminal history." Moreover, when the crime of conviction carries a mandatory life sentence the District Court need not indulge the futile exercise of reciting factors. State v. Jones, 31,613 (La.App. 2 Cir. 4/1/99), 733 So.2d 127, writ denied 99-1185 (La.10/1/99), 748 So.2d 434, and citations therein.
A sentence violates La. Const. art. 1 § 20 if it is grossly out of proportion to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993). A sentence is deemed grossly disproportionate if, when crime and punishment are *799 viewed in light of the harm done to society, it shocks the sense of justice. State v. Lobato, 603 So.2d 739 (La.1992). A sentence within statutory limits will be vacated only on a showing of a manifest abuse of discretion. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. There is no requirement that codefendants receive equivalent sentences; disparity is only one of many factors that bear on constitutional excessiveness. State v. Rogers, 405 So.2d 829 (La.1981); State v. Jackson, 30,473 (La.App. 2 Cir. 5/13/98), 714 So.2d 87, writ denied 98-1778 (La.11/6/98), 727 So.2d 444.
The definition of criminal conduct and provisions of penalties for such conduct is a purely legislative function. State v. Norris, 32,941 (La.App. 2 Cir. 3/1/00), 754 So.2d 362, and citations therein. Pursuant to this function the legislature has enacted the habitual offender statute which has been held, on numerous occasions, to be constitutional. State v. Johnson, supra. Thus the mandatory life sentence of R.S. 15:529.1 is presumptively constitutional. Id. To rebut the presumption, the defendant must show clearly and convincingly that he is exceptional, i.e., because of unusual circumstances he is the victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, gravity of the offense, and circumstances of the case. Id. Although a mandatory sentence may be found constitutionally excessive, the courts have made it clear that such a finding should be rare, not commonplace. State v. Dorthey, 623 So.2d 1276 (La.1993).
Debrow and two associates entered a small grocery store late on a Tuesday night with the intention of robbing it. Debrow and one of his associates were armed, but they did not anticipate armed security. As a result of their own conduct, one of the would-be robbers was killed. Everyone in the room was endangered. When Debrow and his surviving associate fled the store, Officer Smith pursued them in a dangerous chase in which more gunfire was exchanged. Debrow's conduct showed an amoral disregard for life and property. The District Court aptly noted his serious criminal history. This record does not show, clearly and convincingly, that Debrow is exceptional or the victim of the mandates of the habitual offender law, R.S. 15:529.1 A(1)(b)(ii). His concurrent sentences of life and 35 years at hard labor, without benefit, do not shock our sense of justice. This assignment lacks merit.

Conclusion
We have reviewed the entire record and find nothing we consider to be error patent. La.C.Cr.P. art. 920(2). For these reasons, Almetric Debrow's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] The jury found Mitchell guilty on two counts of attempted simple robbery for which he received concurrent sentences of 3½ years at hard labor.
[2] Amended bills of information charged them as principals to the offenses.
[3] Under Manson, a pretrial identification process is considered suggestive if it creates a "very substantial likelihood of irreparable misidentification" and lists the following factors: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and confrontation. See State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, 812.
[4] Article 1004 also sets out three other grounds of admissibility that do not apply to this case.