679 So.2d 963 (1996)
STATE of Louisiana, Appellee,
v.
James L. WILSON, Appellant.
No. 28403-KA.
Court of Appeal of Louisiana, Second Circuit.
August 21, 1996.
*965 J. Wilson Rambo, Monroe, for Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Stephen T. Sylvester, Assistant District Attorney, for Appellee.
Before NORRIS, HIGHTOWER and GASKINS, JJ.
NORRIS, Judge.
James L. Wilson was indicted on two counts of aggravated rape, La.R.S. 14:42, and one count of second degree kidnaping, La. R.S. 14:44.1. A 12-member jury unanimously found him guilty as charged on all counts. The district court imposed the mandatory life sentences at hard labor without benefit of parole, probation or suspension of sentence for each count of aggravated rape and directed these to be consecutive; and 20 years at hard labor for the second degree kidnaping, including two without benefit, and directed this to be concurrent with the other sentences. Wilson now appeals his convictions and sentences; we affirm.

Factual and procedural background
The victim, KRT, testified that in the early morning hours of August 21, 1992 she was asleep in her bed with two of her small children in their apartment on South Fourth Street in Monroe. Around 3:00 she was wakened by a man choking her. She kicked him away, but he pulled a knife and in the ensuing struggle she sustained a minor cut to her left hand. By threatening to kill her and the children, the assailant obtained her compliance. He ordered her to quiet the children, and then to get a blanket and pillow. At knife point he led her into the living room, ordered her to spread the blanket on the floor and to get undressed; he then pulled her night shirt over her head and raped her.
After this was done, he told her she was "going with" him and ordered her to put a blanket in a paper bag; still fearing for her life, she complied. Holding the knife in one hand and placing his other arm around her neck, the assailant led her out the door, stopping first at a nearby front porch to pick up a pair of shoes and a T-shirt, then taking her on an odyssey around South Monroe, eventually ending up at a vacant house on *966 Mississippi Street. There he told her to lay the blanket on the floor and get undressed; he then raped her a second time. After this assault, the assailant fell asleep; KRT grabbed the knife, slipped away from him and ran outside.
Monroe Police Officer Michael Harp testified that he was patrolling down Mississippi Street around 6:30 or 6:45 that morning when a woman dressed in a night shirt and holding a knife flagged him down. She hysterically reported that she had been raped in the back room of the vacant house. Officer Harp, backed up by Officer Jordan, approached the rear of the house and found in the back yard a man trying to put on a pair of pants. When the officers called to him, he quickly pulled up the pants and darted south toward a nearby lumber mill. The officers gave chase on foot and radioed for additional backup. Officer Mercer drove to the mill entrance and saw the suspect run past his patrol car. He then gave chase and tackled the suspect from behind, under a moving conveyor belt.
After he was taken into custody, the suspect told officers that his name was "Teddy V. Kimble," but a medical ID card on his person revealed his name was James L. Wilson. Officer Mercer carried him back to the house on Mississippi Street where KRT positively identified him as the rapist and kidnapper. KRT was then taken to St. Francis Medical Center, where she was treated for the cut on her hand and given a rape test kit; it tested positive for seminal acid and seminal acid phosphate. Officers investigating KRT's apartment found that a window pane had been pried out of place in the kitchen; the pane and a knife were outside the window. Detectives concluded that Wilson had gained entry through this window.
The grand jury indicted Wilson on October 15, 1992. He initially pled not guilty but in April 1993 withdrew that plea and entered the dual plea of not guilty and not guilty by reason of insanity. He moved to appoint a sanity commission; the District Court named Drs. Aris Cox and Gerald Robertson to serve. Arguing that he was mentally retarded, Wilson requested that the court appoint a specialist in mental retardation or developmental disability. The court therefore appointed Dr. Maurice Dayan, a licensed psychologist specializing in mental retardation. At the sanity commission hearing on February 16, 1995, Drs. Dayan and Robertson testified. The court found that Wilson was capable of assisting counsel by relating the details of the alleged offenses, providing a list of witnesses, and listening to witnesses who may testify against him. The court found that Wilson's retardation was not so great that he could not assist counsel. The court found capacity to proceed; trial was held in May 1995.

Discussion: Capacity to proceed
By his fourth assignment Wilson urges the District Court erred in finding capacity to proceed. Specifically, he contends the court imposed a greater burden of proof on the defendant than required by the facts and the jurisprudence. State v. Williams, 381 So.2d 439 (La.1980); State v. Bennett, 345 So.2d 1129 (La.1977).
Mental incapacity to proceed exists when, as a result of a mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense. La.C.Cr.P. art. 641. The two-fold test of capacity to stand trial under this article is whether the accused (1) understands the consequences of the proceedings, and (2) has the ability to assist in his defense by consultation with counsel. Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); State v. Smith, 471 So.2d 954, 956 (La.App.2d Cir. 1985). Mental retardation or sub-normal intelligence is not in itself proof of incapacity. State v. Lawrence, 368 So.2d 699 (La.1979); State v. Smith, supra. The decision as to a defendant's capacity to proceed should not turn solely on whether he suffers from mental disease or defect, but must be grounded in the nature of the charge, the complexity of the case and the seriousness of the decisions he faces. State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983).
Because Louisiana law presumes a person sane and responsible for his actions, *967 the defendant bears the burden of proving he is incapable of standing trial because of mental disease or defect. State v. Bennett, supra. Article 648 A was amended in 1990[1] and provides in pertinent part:
The criminal prosecution shall be resumed unless the court determines by clear and convincing evidence that the defendant does not have the mental capacity to proceed. (emphasis added)
Prior to this amendment, the Code did not suggest a standard by which the defendant had to prove his incapacity; the jurisprudence required a clear preponderance. State v. Gwinn, 373 So.2d 1304 (La.1979); State v. Bennett, supra. Since the amendment, this and another appellate court have still referred to the preponderance standard.[2] The United States Supreme Court has recently held that States may not require defendants to prove their capacity to proceed by any standard greater than a preponderance of evidence. Cooper v. Oklahoma, ___ U.S. ___, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). The transcript does not make it clear which standard the District Court relied upon in finding Wilson competent to proceed. R. pp. 324-326.
The potential error, even if present, does not warrant reversal as the record clearly shows that Wilson failed to prove incapacity to proceed by even the lesser standard of a preponderance. At the sanity hearing, the court heard testimony from Dr. Maurice Dayan, a psychologist who specializes in mental retardation. He examined Wilson for about two hours and performed a series of tests; he also reviewed Wilson's medical and school records and interviewed his mother. He found Wilson's I.Q. to be 69 (± 5 points), which places him in the range of mild mental retardation; if the margin of error is added to this score, Wilson would not be considered mentally retarded by Louisiana's definition, and if the margin is subtracted, Wilson would still be only mildly mentally retarded. Dr. Dayan testified that Wilson scored poorly in cognitive thinking but could think and understand concrete concepts. He felt that Wilson would have difficulty understanding his basic legal rights and directions given by his attorney. He admitted, however, that Wilson could talk with his attorney and relate the events of the offense. Dr. Dayan also testified that Wilson has a history of "conduct disorder," or behavior not in agreement with the normal rules of society, and "oppositional defying," or not following directions.
Dr. Gerald Robertson, a psychiatrist, also examined Wilson; although he did not perform an I.Q. test, he estimated Wilson was functioning in the mildly retarded range. Dr. Robertson also examined hospital records from a closed head injury that Wilson sustained some seven weeks before the instant offenses. Dr. Robertson testified that such an injury could worsen a pre-existing condition such as mental retardation, but this additional impairment would last no more than six months; notably, he examined Wilson nearly 11 months after the injury. He felt that Wilson could identify his attorney and cooperate in his own defense. R.pp. 307, 317. He found that despite the head injury, Wilson could recall these offenses and relate a defense. Dr. Robertson concluded that Wilson understood the nature of the charges against him and their consequences, while conceding that Wilson may not fully grasp all aspects of the legal proceedings. R.p. 308.
Dr. Aris Cox did not testify at the hearing, but his report was admitted into evidence on stipulation that he was on probation with the medical board because of personal substance abuse. Dr. Cox reported that Wilson was able to relate to him the events leading to these charges and the facts surrounding his arrest. Dr. Cox believed that Wilson was mildly mentally retarded but not enough to preclude his competency. According to Dr. Cox, Wilson understood the functions of the officials of the court, the defenses available, and the various pleas he could enter; he also understood the role of his attorney. Dr. Cox *968 stated that based on his understanding of the standards set out in State v. Bennett, supra, in his opinion Wilson was competent to stand trial.
One lay witness, Deputy Washer of the Ouachita Parish jail, testified that Wilson interacts with the other prisoners and follows directions.
On this evidence we cannot say the District Court abused its discretion in finding Wilson competent to proceed. The court was certainly entitled to resolve the conflict between the well-founded medical opinions of the experts, accepting that of Drs. Robertson and Cox over the contrary view of Dr. Dayan. State v. Brooks, 541 So.2d 801, 807 (La.1989); State v. Bibb, supra. The court was able not only to compare the merits of the expert testimony,[3] but also to observe Wilson's apparent understanding at the hearing. The record does not undermine the finding that Wilson fully understands the consequences of the proceedings and is able to assist counsel in his defense.
This assignment does not present reversible error.

Insanity at the time of the offense
By his first and fifth assignments of error Wilson urges that the verdict is in error because at the time of the offenses he suffered from a mental disease or mental defect that rendered him incapable of distinguishing between right and wrong with reference to the conduct in question.[4] La.R.S. 14:14. The thrust of the argument is that both experts who testified at trial verified that Wilson suffered a head injury only weeks before these offenses, and the effect of this injury upon his pre-existing retardation so impaired his judgment at the time of the offenses that it necessitates a finding of insanity under R.S. 14:14.
Every person is presumed to be sane; if he pleads not guilty and not guilty by reason of insanity he has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. La.C.Cr.P. art. 652; State v. Widenhouse, 582 So.2d 1374 (La.App.2d Cir.), writ denied 586 So.2d 567 (La.1991), cert. denied 503 U.S. 910, 112 S.Ct. 1274, 117 L.Ed.2d 500 (1992). The defendant must show that he suffered from a mental disease or defect that rendered him incapable of distinguishing right from wrong with reference to the conduct in question. La.R.S. 14:14; State v. Widenhouse, supra.
The standard of appellate review is whether the defendant adduced sufficient evidence of his insanity at the time of the offense such that any rational trier of fact, viewing the evidence in light most favorable to the prosecution, could conclude that the defendant did not prove by a preponderance of evidence that he was insane at the time of the offense. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Roy, 395 So.2d 664 (La.1981).
Dr. Dayan reiterated at trial that Wilson was mildly mentally retarded and tended to understand only the objects of his immediate experience. He also testified that from his observations and the patient's history, he felt Wilson has always had difficulty grasping the concept of right and wrong and understanding the consequences of his actions. He admitted, however, that he did not ask Wilson about the offenses at issue and, on cross examination, he declined to express an opinion as to Wilson's ability to distinguish between right and wrong at the time of the offenses. R.p. 477-478.
Dr. Robertson testified regarding the closed head injury that Wilson sustained on July 1, 1992. Referring to hospital records, he described the injury as a trauma to the left frontal portion of the head with fractures of the skull, some bleeding and some contusions to the area. Dr. Robertson stated that Wilson's mental capacity at the time of the *969 offense was probably compromised by the head injury; that and the history of mild mental retardation would make him especially vulnerable to the effects of any mind-altering substance. The effects of the head injury could last from three to six months. Dr. Robertson's opinion was that Wilson was suffering "some" impairment of judgment at the time of the offenses. On cross examination, however, he admitted he could not state unequivocally that Wilson lacked the capacity to know right from wrong at the time of the offenses. He added that people with mild mental retardation usually know the difference between right and wrong.
At the outset we observe that despite Wilson's contentions in brief and the hypothetical questions posed to the experts, there is no record evidence to show that he was under the influence of drugs or alcohol at the time of the offenses.[5] We therefore find that the only relevant considerations are Wilson's mild mental retardation and the recent closed head injury, and their effect on his ability to know right from wrong.
The thrust of Dr. Dayan's testimony was that Wilson thought concretely, not abstractly, could understand only the objects of immediate experience, and would not really grasp the consequences of his actions. Dr. Robertson would not state an opinion as to Wilson's capacity at the time of the offense. The record shows that Wilson was fairly sophisticated in attaining distant objectives through immediate action. He apparently understood that he needed two knives, one to pry open the window and the other to intimidate KRT; he stashed shoes and a shirt on a nearby front porch, perhaps in anticipation of a long walk; he knew he would want a blanket to lie on in a vacant house, and realized that it would look less suspicious in a paper bag as he led his victim through South Monroe; he fled the instant he saw officers, and gave a false name upon capture. These acts strongly suggest an ability to foresee the consequences of his acts and to conceal them. With the expert testimony and the facts adduced, the jury was entitled to find that Wilson suffered from impaired judgment at the time of the offenses, but not such that he could not tell right from wrong. The evidence meets the standard of Jackson v. Virginia, and this assignment lacks merit.

Jury instructions
By his seventh and eighth assignments Wilson contests two passages from the jury charge. The first pertains to diminished capacity:

Weakness of mind or a diminished capacity cannot excuse an accused when there exists the capacity to know that the act in question is wrong. Insanity, whatever its form, to be an excuse for the commission of a crime, must be of such a nature as to render the defendant incapable of distinguishing right from wrong. * * *
Louisiana does not recognize the doctrine of diminished capacity. Therefore, a mental defect short of legal insanity cannot serve to negate specific intent and, thus, reduce the degree of the crime.
R.pp. 187-188 (emphasis added).
In arguing his objection to this charge, Wilson urged that the emphasized portions should be deleted because the doctrine of diminished capacity was not applicable to the case, and that the charge was confusing as it might lead the jury to think the evidence of mental retardation was evidence of diminished capacity and not evidence to support the insanity defense. Supp., 37-38. In brief he now argues that this defective instruction denied him due process and a fair trial.
A jury charge must be considered as a whole, and particular phrases in a charge must be construed in the context of the entire charge. A conviction will not be reversed on the ground of an erroneous charge unless the disputed portion, viewed with the remainder of the charge, is erroneous and prejudicial. State v. Motton, 395 So.2d 1337 (La.1981), cert. denied 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981); *970 State v. Daniels, 614 So.2d 97 (La.App.2d Cir.), writ denied 619 So.2d 573 (La.1993).
We do not perceive any error in the contested charge. It correctly states that Louisiana does not recognize the defense of diminished capacity. State v. Jones, 359 So.2d 95 (La.1978), cert. denied 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed.2d 708 (1978); State v. Pravata, 522 So.2d 606 (La.App. 1st Cir.), writ denied 531 So.2d 261 (La.1988). It also correctly cautions the jury that evidence of the defendant's mental condition is to be used only to determine his sanity, not to negate the specific intent element of the charged offenses. State v. Pravata, supra. This was important because Wilson's entire case consisted of expert testimony as to his impaired mental condition. Since the charge is neither wrong nor misleading, this assignment lacks merit.
By his eighth assignment Wilson contests the portion of the charge pertaining to reasonable doubt:
If, after giving a fair and impartial consideration to all facts in the case, you find the evidence or lack of evidence unsatisfactory upon any single point indispensably necessary to constitute the defendant's guilt, this would give rise to such a reasonable doubt as would justify you in rendering a verdict of not guilty.
R.p. 180 (emphasis added).
Wilson did not object to this instruction at trial. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of its occurrence. La.C.Cr.P. art. 841; State v. Hamilton, 594 So.2d 1376 (La.App.2d Cir.1992). Strictly speaking, this objection has been waived. However, because reasonable doubt instructions are exceedingly important in the wake of Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), and Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), we have reviewed his argument.
In brief Wilson concedes that this instruction is not identical to that in Cage, supra, but argues that by including the emphasized language it "gives the impression that only certain types of reasonable doubt are big enough or important enough to justify a verdict of not guilty." We disagree; read in its entirety, this instruction does not overstate the dimensions of reasonable doubt. In fact, this very paragraph has withstood Cage challenges in the recent cases of State v. Smith, 91-0749 (La. 5/23/94), 637 So.2d 398, and State v. Bolden, 95-749 (La.App.3d Cir. 4/17/96), 680 So.2d 6. This assignment of error lacks merit.

Pretrial motions
By his third and sixth assignments of error Wilson contests the denial of two of his pretrial motions. The first was a motion for the collection and preservation of evidence in which Wilson sought to compel KRT to provide a urine or blood sample to test for controlled dangerous substances, particularly cocaine. Wilson's motion alleged that KRT engaged in consensual sex with him in exchange for cocaine and that a drug test was necessary to present his defense.
At the hearing on the motion Ms. Linda Armstrong of the North Louisiana Crime Lab testified that cocaine can be detected in a person's urine within 24 hours of its use. She also testified that after 24 hours most of it is excreted, making it impossible to tell at the time of the hearing, February 1993, whether KRT was using cocaine at the time of the offenses, August 1992. The court denied the motion, finding the urine test would be irrelevant in that it would not show the victim was using cocaine at the time of the offenses.
In brief Wilson urges that this ruling deprived him of his constitutional right to present a defense. Relevant evidence is that tending to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.Ev. art. 401. Like the District Court, we do not see how the proposed test, which could detect cocaine in the victim's system for only 24 hours, could possibly prove her condition nearly six months earlier. In addition, Wilson has cited no authority for compelling the victim of a sex offense to submit to chemical tests. Courts are generally reluctant to order the victims of sex crimes to *971 submit to further examinations. State v. Gerhart, 583 So.2d 843 (La.App. 5th Cir. 1991); State v. Garay, 453 So.2d 1003 (La. App. 4th Cir.1984). On the present showing, we see no need to depart from the general practice.
Wilson also complains of the court's refusal to let him call KRT to testify at the hearing on the motion. Nevertheless, he cross examined her at trial without asking her about past or present cocaine use. He also cross examined the expert, Mr. Stracener, who examined the rape kit taken from KRT immediately after the offenses; he did not ask this witness about the victim's potential cocaine use. Wilson knew from pretrial discovery the name of the doctor who took the rape kit from KRT at St. Francis on the morning of the offenses, but did not subpoena him. Since Wilson had access to alternative sources of the same testimony, he was not prejudiced by the trial court's ruling. State v. Gerhart, supra.
By his sixth assignment Wilson contests the denial of his motion to quash or, alternatively, to limit evidence. In the course of discovery, counsel sought copies of Wilson's mental health records at Monroe Mental Health Center. A records manager replied by letter of November 1, 1993 that Wilson's last visit to the facility was in August 1982 and that his record had been destroyed and was no longer available. At the sanity hearing Dr. Robertson testified that the information would have been "perhaps a little bit" helpful to his evaluation. Wilson filed the instant motion to quash or, alternatively, to limit the State's presentation of evidence as to Wilson's capacity. He asserted that the State's actions deprived him of the right to present a defense and the right to judicial review based on a complete record of his medical history. After a hearing the District Court denied the motion to quash and reserved ruling on the motion to limit. R.p. 337.
In brief Wilson again urges that the destruction of his medical records by Monroe Medical Health, an agency of the State, should be attributed to the prosecution, and deprived him of a complete medical history for use by the sanity commission. He adds that the State's conduct effectively denied him due process.
At the hearing, counsel denied that any prosecutorial misconduct was involved in the destruction of the records. R.p. 332. Without a showing of malicious, prejudicial governmental misconduct, the defendant has not stated grounds for quashing the indictment. La.C.Cr.P. art. 532; State v. Walker, 567 So.2d 581 (La.1990); State v. Caldwell, 616 So.2d 713 (La.App. 3d Cir.), writ denied in part, granted in part (on other grounds) 620 So.2d 859 (La.1993).
At the beginning of trial, Wilson again urged his motion to limit the State's presentation of evidence of the defendant's capacity. The court stated it would reserve the issue until it was presented. Supp., 31. The State offered no evidence of Wilson's mental capacity either in its case in chief or on rebuttal. Dr. Dayan testified for the defense that he was unable to get the Monroe Mental Health records and these would have been "very important" to verify his current findings. However, he stated he got equivalent information from Wilson's school records. Also testifying for the defense, Dr. Robertson mentioned that he had been unable to get those records; he did not say it impaired his ability to evaluate Wilson. R.p. 494. On this record, we cannot say that Wilson was prejudiced in any way by the destruction of the old mental health records. Moreover, it would be unreasonable to require the Department of Health and Hospitals to retain its records indefinitely.[6] The District Court did not err in denying the motion to quash or limit evidence, and this assignment lacks merit.

Excessive sentence
By his second and ninth assignments Wilson urges the District Court erred in imposing an excessive sentence and in denying his motion to reconsider the sentence. He mainly *972 argues that consecutive sentences were not warranted for two counts of aggravated rape which, he contends, arose from a single course of conduct. He also argues that "maximum sentences" for the offenses of aggravated rape were not warranted for a defendant who is not the worst type of offender and offenses not conducted in the worst possible manner.
When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La.C.Cr.P. art. 883. However, concurrent sentences arising out of a single course of conduct are not mandatory; consecutive sentences under those circumstances are not necessarily excessive. State v. Williams, 445 So.2d 1171 (La.1984); State v. Pickett, 628 So.2d 1333 (La.App.2d Cir.1993), writ denied 94-0348 (La. 5/20/94), 637 So.2d 476. The District Court has discretion to order consecutive rather than concurrent sentences. State v. Derry, 516 So.2d 1284 (La.App.2d Cir.1987), writ denied 521 So.2d 1168 (La. 1988). If the court chooses consecutive sentences, it must state the factors considered and the reasons for the consecutive terms. State v. Green, 614 So.2d 758 (La.App.2d Cir.1993). Relevant factors include the defendant's criminal history, the gravity or dangerousness of the offenses, the viciousness of the crimes, the harm done to the victims, and whether the defendant poses an unusual risk of danger to the public. State v. Pickett, supra, and authorities therein.
At sentencing the court stated that the aggravated rapes were two separate and distinct acts. R.p. 526. While we feel that both acts arose from the same continuous course of conduct, the court nevertheless expressed sufficient reasons to justify consecutive sentences for the individual counts of rape. The court noted prior convictions for carnal knowledge of a juvenile and for aggravated burglary, the latter arising from Wilson's entry of a woman's home through a window and threatening her. The court also noted Wilson's pending charges, at the time of the instant conviction, of forcible rape and aggravated burglary, the latter also involving an unauthorized entry into a woman's home and a sexual battery. The court justly concluded that Wilson has "proclivity to commit crimes of violence against women" and poses a "danger and menace to society." R.p. 524. The court also noted an extensive juvenile record dating back to age eight and disclosed in Wilson's medical records. On the facts presented, the District Court was entitled to find that Wilson poses an unusual risk to public safety and to direct that these sentences be served consecutively.
Wilson finally argues that the mandatory life sentence of the aggravated rape statute "flies in the face of" jurisprudence authorizing and requiring downward departure from mandatory sentences when necessary to fit the offender and offense. State v. Dorthey, 623 So.2d 1276 (La.1993). We note, however, that State v. Dorthey does not in any way address or discuss the mandatory sentence for aggravated rape.[7] On the contrary, the courts have repeatedly declined to hold that the mandatory life sentence for aggravated rape violates the constitutional prohibition against cruel and unusual punishment. State v. Prestridge, 399 So.2d 564, 582 (La.1981); State v. Clark, 437 So.2d 879, 887 (La.App.2d Cir.), writ denied 442 So.2d 460 (La.1983); State v. Kennedy, 569 So.2d 242, 246 (La.App. 1st Cir.1990), writ denied 575 So.2d 387 (La.1991). On the basis of this offender and these offenses, the imposition of life sentences, even consecutively, does not shock our sense of justice.
These assignments lack merit.

Conclusion
We have reviewed the entire record and find nothing we consider to be error patent. La.C.Cr.P. art. 920(2). James L. Wilson's convictions and sentences are therefore
AFFIRMED.
NOTES
[1] La. Acts 1990, No. 775, § 1, effective September 7, 1990.
[2] State v. Williams, 26,716, p. 12 (La.App.2d Cir. 5/10/95), 658 So.2d 703, 709 (op. on orig. hearing), writ denied 95-2175 (La. 2/2/96), 666 So.2d 1091; State v. Bibb, 626 So.2d 913, 927 (La.App. 5th Cir.1993), writ denied 93-3127 (La. 9/16/94), 642 So.2d 188.
[3] Even from the impassive record Dr. Dayan appears to have a great interest in qualifying claimants for Social Security. R.pp. 296-297.
[4] Specifically, the first assignment asserts insufficient evidence to support the conviction, based solely on grounds that the jury should have found him unable to distinguish right from wrong. The fifth assignment contests the District Court's denial of his motions for new trial, in arrest of judgment and for post verdict judgment of acquittal.
[5] Wilson argues that the hospital records involving his treatment for the closed head injury on July 1, 1992 showed him to have a blood alcohol level of .15% at that time, but this is obviously not evidence of his intoxication on the morning of August 21, 1992.
[6] In general, public bodies are required to retain records only for three years. La.R.S. 44:36. In 1982, the time was six years. See La. Acts 1983, 1st Ex.Sess., No. 11. The mental health records requested by Wilson in 1993 were at least 11 years old.
[7] In Dorthey the Supreme Court upheld the validity of the multiple offender statute, R.S. 15:529.1, but ruled that it did not mandate the imposition of the maximum enhanced sentence.