MOORE, J.
 

 | ¡¡The defendant, Lisa Robinson, was convicted as charged of second degree murder for the stabbing death of Richard England, an enlisted airman stationed at Barksdale Air Force Base. She was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. She now appeals her conviction, alleging three errors at trial. Finding no merit in the assignments of error, we affirm the conviction and sentence.
 

 Facts
 

 Emily Moore, now Emily Moore McKenzie, resided in the Haystack Apartments in Shreveport in the fall of 2007. Although the victim, Richard England, had his own apartment in another complex, he resided mostly in Moore’s apartment with Emily and her son, Cole. While living at the Haystack Apartments, Moore befriended the defendant, Lisa Robinson, age 18, who lived in the complex with her father. Approximately two weeks Lprior to the murder on October 29, 2007, Lisa’s father put her out of his apartment. She went to Moore’s apartment and asked to stay there, and Moore let the defendant sleep on the sofa in her apartment.
 

 Soon Moore began to notice that small amounts of money and bottles of liquor were inexplicably missing from her purse or the apartment. On the weekend of October 26, 2007, Richard, Emily and her son went camping at Harmon - Lake on Barksdale AFB grounds. On.ce there, Emily discovered that her credit card was missing from her wallet. The couple returned to Richard’s apartment early on October 28 where Emily checked her credit card balance online. She discovered that charges had been made on the card up to the card’s maximum charge limit. She- called, the credit card company and learned that the transactions had been made while she and Richard were camping. Emily and Richard then planned- to catch Lisa doing something wrong. Emily called Lisa and told her they would be late coming in from their camping trip. In fact, the couple planned to return to the apartment early, hoping they would catch her doing something improper there.
 

 When the couple returned to Emily’s apartment, they found Lisa on the computer. Emily searched Lisa’s purse when she was out of the room but found nothing incriminating. Richard searched the computer for transactions. He discovered several credit card transactions had been made |4on Emily’s computer: Emily also found three shirts in her son’s closet where Lisa kept her clothes, one with the price tag still on it. The vendor and price tag corresponded to one of the unauthorized credit card transactions.
 

 
 *1110
 
 Emily and Richard confronted the defendant that Sunday evening and told her she had to get out of the apartment. Lisa denied the accusations and blamed Richard for turning Emily against her. Ultimately, Richard and Emily placed Lisa’s clothes in three white plastic trash bags and in a Mickey Mouse bag of Lisa’s. They placed them by or just outside the front door. Emily handed Lisa her purse, and Lisa went outside the apartment to a nearby stairwell. Richard and Lisa had a final exchange in which Lisa told him that he had better watch out — she knew his car and she just might steal it too.
 

 The couple went to bed very late, discussing the events of the day. They planned to go to the police in the morning to file a complaint against Lisa regarding the credit card. Emily testified that she got up around 6:30 a.m., got Cole and herself dressed, and left at 7:35 to take Cole to daycare in Bossier City. She said that when she left the apartment, Richard was awake, but still lying in bed, nude, calling the base to explain why he would not report for physical training that morning.
 

 |fiOn her way back to the apartment, Emily received a call on her cell phone from Richard. She testified that he was gasping for air and said, “She’s stabbing me[!]Lisa[ — jshe’s stabbing me!”
 
 [1]
 
 Emily testified that she heard Lisa yelling in the background. The call was abruptly disconnected. Richard called again, relating the same message but was disconnected again. Emily then called 911.
 

 When she arrived minutes later, police and other people had gathered outside near her apartment. Richard lay naked on the ground, covered in blood from multiple stab wounds and lacerations. Emily, who is a registered nurse, attempted CPR until an emergency medical team arrived and took Richard to the hospital where he was pronounced dead.
 

 Emily reported to police the cell phone call from Richard and the credit card incident. Police began searching for the defendant, who eventually returned to the complex and met with police there that evening. The investigation of the crime scene and surrounding area yielded evidence incriminating Lisa, as well as evidence obtained from the subsequent investigation. The defendant was initially charged with first degree murder, but the charge was subsequently changed to second degree murder.
 

 The evidence at trial indicated that Lisa probably spent the night outside at the Haystack apartments. She spoke with her former boyfriend, 16Zion George, until 2:00 a.m. She was seen by other tenants outside the complex later that morning. The evidence further shows that Lisa entered Emily’s apartment through a window shortly after Emily left to take Cole to Waller Childcare in Bossier City, perhaps to recover the camcorder she had purchased with Emily’s credit card and hidden under Cole’s bed. Richard was still in the apartment, perhaps still in bed or on the sofa when the attack occurred.
 

 Lisa initially denied that she was involved in the incident, but later claimed to police that she went to the apartment to retrieve her purse. She said Richard answered the door, clothed only in a towel and wielding a knife. She said she subsequently entered the apartment through a window to get her purse from the sofa. However, the purse was recovered by police outside the apartment with her other
 
 *1111
 
 bags. Lisa said that Richard attacked her with a knife, and while they wrestled on the floor, he was cut. She denied stabbing him.
 

 By a vote of 11-1, a jury convicted the defendant as charged. The court imposed the mandatory life sentence without benefit of parole, probation, or suspension of sentence. The defendant filed this appeal.
 

 Discussion
 

 |7By her first assignment of error, the defendant contends that the evidence is insufficient to convict her of the crime of second degree murder even when viewed in the light most favorable to the state. Specifically, she contends the state failed to show that the murder occurred during a predicate felony for a second degree murder conviction. She contends that the evidence proves only manslaughter, if any crime.
 

 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 2001-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Cummings,
 
 95-1377 (La.2/28/96), 668 So.2d 1132. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Robertson,
 
 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords | Rgreat deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Hill,
 
 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758,
 
 unit denied,
 
 2007-1209 (La.12/14/07), 970 So.2d 529;
 
 State v. Gilliam,
 
 36,118 (La.App. 2 Cir. 8/30/02), 827 So.2d 508,
 
 writ denied,
 
 2002-3090 (La.11/14/03), 858 So.2d 422.
 

 The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983);
 
 State v. Parker,
 
 42,311 (La.App. 2 Cir. 8/15/07), 963 So.2d 497.
 

 La. R.S. 14:30.1 states in pertinent ' part:
 

 A. Second degree murder is the killing of a human being:
 

 (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
 

 (2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated 19kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
 

 
 *1112
 
 Specific intent is the state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1);
 
 State v. Lindsey,
 
 543 So.2d 886 (La.1989),
 
 cert, denied,
 
 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. See La. R.S. 14:10(1);
 
 State v. Draught,
 
 05-1825 (La.1/17/07), 950 So.2d 583,
 
 cert, denied,,
 
 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007).
 

 The determination of whether the requisite intent is present in a criminal case is for the trier of fact.
 
 State v. Huizar,
 
 414 So.2d 741 (La.1982);
 
 State v. Hill,
 
 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758,
 
 writ denied,,
 
 07-1209 (La.12/14/07), 970 So.2d 529. In reviewing whether such a determination is correct, the court should review the evidence in the light most favorable to the prosecution and determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a | inreasonable doubt as to every element of the offense.
 
 Jackson v. Virginia, supra; State v. Huizar, supra.
 

 La. R.S. 14:31 provides in relevant part:
 

 A. Manslaughter is:
 

 (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed!.]
 

 In the .present case, to sustain the conviction for second degree murder, the evidence must show that the defendant had the specific intent to kill or commit great bodily harm, or that the killing resulted while she was engaged in an aggravated burglary, even though she had no specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(2). Aggravated burglary is defined under La. R.S. 14:60, in pertinent part, as “the unauthorized entering of any inhabited dwelling ... with the intent to commit a felony or any theft therein, if the offender, (1) is armed with a dangerous weapon; or (2) after entering arms himself with a dangerous weapon; or (3) commits a battery upon any person while in such place, or in entering or leaving such place.”
 

 InAIthough the defendant concedes that she committed an unauthorized entry into the apartment by crawling through a window to get inside, she contends that she had no intent to commit a felony or theft inside the apartment. She contends that she entered to retrieve her own property therein, and the evidence does not show that she took anything not belonging to her. She argues that she was surprised by Richard being in the apartment; she thought he was at work. She told police that it was Richard who attacked her with the knife and in the ensuing struggle, he got stabbed while she defended herself.
 

 We observe that the record shows that the defendant initially denied that she was anywhere near the scene of the crime when the victim was stabbed. The story evolved after repeated questioning by police regarding the conflicts in her prior false statements. She told police that she went to the apartment to retrieve her purse, which she did not obtain; however, police found her purse outside the apart
 
 *1113
 
 ment with her clothing and other personal effects.
 

 The trial testimony also revealed that the defendant purchased a camcorder and gift bag from Target using Emily Moore’s stolen credit card. After Lisa was kicked out of Emily’s apartment, she went to see her former boyfriend, Zion George. According to Zion’s testimony, Lisa told him that |12she had purchased a camcorder for his birthday gift, and she would give it to him the following day. This camcorder was found after the homicide under the bed against the wall in Cole’s bedroom where Lisa kept her things. We think that the evidence shows that it is more likely that Lisa intended to retrieve this illegally purchased item from the apartment.
 

 Nevertheless, for the following reasons, we find that a reasonable jury could conclude that the evidence clearly shows that the defendant had specific intent to kill Richard England. Irrespective of whether she was surprised by finding him in the apartment, the following evidence shows that she attacked Richard England and repeatedly stabbed him with the specific intent to kill.
 

 Foremost, the testimony of Emily Moore regarding Richard’s cell phone call during the attack reflected that it was the defendant who attacked Richard, not the converse. Lisa’s voice was well known to Emily. She testified that she could hear Lisa yelling while Richard called her on his cell phone, gasping for breath and stating, “She’s stabbing me[!] Lisa[ — jshe’s stabbing me!” Emily testified that she was one hundred per cent sure that the defendant was identifying his assailant when he said her name, “Lisa.”
 

 Dr. Stephen Erickson, the forensic pathologist who examined Richard’s body, testified that the knife wounds were caused by a serrated | ^kitchen knife. The wounds on Richard’s' palms and between his fingers were characteristic of defensive wounds on a person who was fighting off a knife attack. Richard was a healthy, fit, fairly large man, 6’2" tall, compared to the defendant, who is 5’5". While Richard suffered several deep stab wounds, including the fatal stab wound that pierced his heart in two places, as well as several cuts and lacerations, the defendant was unscathed — no cuts, bruises or other visible injuries, except for a slight abrasion under her upper lip.
 

 Thus, the severity of the wounds Richard received and the lack of injury to the defendant tends to indicate that the defendant was indeed the aggressor in the events. The autopsy revealed that many of the victim’s wounds appeared to have been inflicted in a manner suggesting that the victim was in a defensive posture during the attack. Further, the victim’s wounds were such that Dr. Erickson felt may have been hesitation wounds, revealing an intent to inflict further injury evidencing an intent to kill.
 

 Additionally, testimony at trial shows that Lisa threatened Richard the night before the murder after she was put out of the apartment. She apparently spent the night at the complex, unable to get Ashlee Buras to pick her up. Buras testified that she somewhat leery of Lisa because Lisa blamed her for losing her job and made a threat. Lisa was seen around the 114complex later at various times during the night ‘and in the morning before the murder, apparently waiting for Emily to leave before entering the apartment.
 

 We conclude, therefore, that the evidence proved beyond a reasonable doubt that Lisa had the specific intent to kill Richard England. The jury apparently rejected the defendant’s self-defense and manslaughter theories.
 

 
 *1114
 
 Moreover, we conclude that the evidence proved beyond a reasonable doubt that Lisa made an unauthorized entry into the apartment with the intent to commit a felony or theft therein, and, while armed with a dangerous weapon, committed a battery on Richard England.
 

 This assignment is therefore without merit.
 

 By her second assignment of error, the defendant contends that it was ineffective assistance of counsel for defense trial counsel to fail to object to the trial court’s restriction of the jury charge relating to proof of manslaughter.
 

 Prior to submitting the case to the jury, the trial court, with the approval of both the prosecutor and defense counsel, elected to omit from the manslaughter definition an instruction regarding that part of La. R.S. 14:31(A)(1) referring to a homicide committed in “sudden passion” or “heat 11sof blood” sufficient to deprive an average person of his self-control and cool reflection. It appears that defense counsel elected, based on the evidence adduced, to argue for a verdict of manslaughter under paragraph (A)(2), that is, a homicide committed without any intent to cause death or great bodily harm when the perpetrator is not engaged in one of the enumerated felonies under second degree murder.
 

 The state argues that the defendant failed to object to the court’s charge to the jury, and is seeking to circumvent this deficiency by claiming ineffective assistance. The state, further argues that .the facts of the case did not apply to a ,manslaughter in “sudden passion” or “heat of blood”; thus there was no need for the defendant’s trial counsel to object to the jury charge. Finally, the state notes that the defendant has not shown that there is a reasonable likelihood that the outcome of the trial would have been different if counsel had objected to the jury charge.
 

 As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief (“PCR”) in the trial court rather than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930.
 
 State ex rel. Bailey v. City of West Monroe,
 
 418 So.2d 570 (La.1982);
 
 State v. Ellis,
 
 42,520 (La.App. 2 Cir. 9/26/07), 966 So.2d 139,
 
 writ denied,
 
 07,02190 (La.4/4/08), 978 So.2d 325. A motion for new trial is also an accepted vehicle by which to raise such a claim.
 
 Id.
 
 When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy.
 
 State v. Ratcliff,
 
 416 So.2d 528 (La.1982);
 
 State v. Willars,
 
 27,394 (La.App. 2 Cir. 9/27/95), 661 So.2d 673.
 

 The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution.
 
 State v. King,
 
 2006-1903 (La.10/16/07), 969 So.2d 1228;
 
 State v. Wry,
 
 591 So.2d 774 (La.App. 2 Cir.1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 

 To establish that her attorney was ineffective, the defendant first must show that counsel’s performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. The relevant inquiry is whether counsel’s representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases.
 
 Strickland, supra.
 
 The assessment of an attorney’s per
 
 *1115
 
 formance requires his conduct to be | ^evaluated from counsel’s perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel’s judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment.
 
 State v. Grant,
 
 41,745 (La.App. 2 Cir. 4/4/07), 954 So.2d 823,
 
 writ denied,
 
 2007-1193 (La.12/7/07), 969 So.2d 629;
 
 State v. Moore,
 
 575 So.2d 928 (La.App. 2 Cir.1991).
 

 Second, the defendant must show that counsel’s deficient performance prejudiced her defense. This element requires a showing the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable.
 
 Strickland, supra.
 
 The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings; rather, she must show that but for counsel’s unprofessional errors, there is a reasonable probability the outcome of the trial would have been different.
 
 Strickland, supra; State v. Pratt,
 
 26,862 (La.App. 2 Cir. 4/5/95), 653 So.2d 174,
 
 writ denied,
 
 95-1398 (La.11/3/95), 662 So.2d 9. A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice.
 
 Strickland, supra; State
 
 v.
 
 Jordan,
 
 35,643 (La.App. 2 Cir. 4/3/02), 813 So.2d 1123,
 
 unit denied,
 
 2002-1570 (La.5/30/03), 845 So.2d 1067.
 

 In
 
 State v. Allen,
 
 2003-2418 (La.6/29/05), 913 So.2d 788,
 
 cert. denied,
 
 547 U.S. 1132, 126 S.Ct. 2023, 164 L.Ed.2d 787, the Louisiana Supreme Court stated that “the failure to object to a valid error may be the proper subject of a post conviction claim of ineffective assistance of counsel.” Conversely, the failure to object to invalid errors may not be the proper subject of such a claim.
 
 State v. Grant, supra.
 

 The defendant argues that manslaughter was a viable defense in this instance because the situation was a classic domestic dispute that suddenly and unexpectedly became deadly. The defense further argues that an attempt by defense counsel to merely focus on a defense based on the defendant not having intent to kill or cause bodily harm fell below the standard of reasonableness and competency required by prevailing professional standards.
 

 After closing arguments, the trial court held a conference regarding the jury instructions. The trial judge indicated he was inclined to delete a portion of the manslaughter charge, being of the view that the portion of the charge pertaining to “sudden passion or heat of blood” was not applicable. Both the state and defense counsel agreed to delete the charge.
 

 | ij/The portion of the jury charge deleted read as follows:
 

 A. Manslaughter is ...
 

 A homicide which would be murder under Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled or that an average person’s blood would have cooled, at that time offense was committed!/]
 

 The general rule regarding errors in the jury charge is that, unless objected to contemporaneously, an irregularity or error in the charge to the jury may not be asserted on appeal. La. C. Cr. P. art. 841;
 
 State v. Belgard,
 
 410 So.2d 720 (La.1982);
 
 *1116
 

 State v. Wilson,
 
 28,403 (La.App. 2 Cir. 8/21/96), 679 So.2d 963.
 

 During the conference to finalize the jury charges, the defendant did not make any objection to the proposed charges and actually agreed with deleting the portion of the charge. Defense counsel noted that the defense was arguing under the theory of the second paragraph of the charge, and thus it would be permissible for the trial court to delete the first portion of the charge.
 

 Because the trial counsel agreed to the amendment of the jury charge, there was no contemporaneous objection made. While this would generally |¡,npreclude review by this court, the fact that the defendant contends her counsel was ineffective warrants further consideration of the assignment of error. The instant record is adequate to consider this assignment.
 

 The claim that trial counsel should not have limited the jury charge regarding manslaughter implicates the attorney’s trial
 
 strategy,
 
 but this is not the inquiry for ineffective assistance of counsel. The relevant inquiry is whether counsel’s representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. Defense counsel was working with a situation in which his client admitted to the unlawful entry into the apartment and, according to her story, engaged in a physical struggle with the victim. The defendant denied stabbing the victim, only admitting that during their struggle, he was injured. Further, she provided various stories regarding how she got into the apartment and why she was there. She maintained that she did not stab the victim, but she did see blood appear on various parts of his body.
 

 Defense counsel stated at trial that the defense theory of the case did not involve the deleted portion of the jury charge. As previously noted, this court must give great deference to trial counsel’s judgment, tactical ^decisions and trial strategy, strongly presuming he has exercised reasonable professional judgment.
 
 State v. Grant, supra; State v. Moore, supra.
 

 In
 
 State v. Lombard,
 
 486 So.2d 106 (La.1986), the Louisiana Supreme Court explained:
 

 [T]he presence of “sudden passion” or “heat of blood” distinguishes manslaughter from murder. The court has stated on several occasions, however, that “sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather,'they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a “sudden passion” or “heat of blood” is entitled to a manslaughter verdict. Where such proof has been introduced, a second degree murder verdict is inappropriate.
 
 (Citations omitted.)
 

 On the first prong of the
 
 Strickland
 
 test, the defendant must show that counsel’s performance was deficient. As noted above, the defense in this .case was limited by the defendant’s inculpatory statement as well as the evidence adduced during trial. There was little presented to show that the killing could have been committed in sudden passion or heat of blood. Certainly the time period between the evening before, when Emily and Richard put the defendant out of the apartment, until the next morning when the offense occurred, was sufficient time for her blood to have “cooled.” Based on this record, we cannot conclude that defense counsel erred.
 

 
 *1117
 
 | ppEven if we presumed that defense counsel erred in failing to object to the jury instruction, on the second prong of the test, the defendant must show that counsel’s deficient performance prejudiced her defense. As we have concluded that the evidence presented was sufficient to convict the defendant of the charged offense, she simply cannot show that she was deprived of a fair trial and prove actual prejudice. The state’s evidence clearly established that she committed second degree murder. The circumstances, as established by the evidence, do not support a manslaughter verdict. The jury rejected this theory. We conclude, therefore, that deleting the portion of the manslaughter jury charge did not prejudice this defendant.
 

 Accordingly, this assignment of error is without merit.
 

 By her third assignment of error, the defendant contends that the trial court erred in overruling her objection to the introduction of gruesome autopsy photographs.
 

 The state contends that the trial court did not abuse its discretion in overruling her objection as the photographs illustrated the particular wounds inflicted by the defendant and were not such that they overwhelmed the jurors’ reason. We agree.
 

 1 ¡^Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted.
 
 State v. Washington,
 
 30,-866 (La.App. 2 Cir. 8/19/98), 716 So.2d 936,
 
 writ denied,
 
 98-2473 (La.1/8/99), 734 So.2d 1229. Additionally, the cumulative nature of photographic evidence does not render it inadmissible if it corroborates the testimony of witnesses on essential matters.
 
 State v. Langley,
 
 95-1489 (La.4/14/98), 711 So.2d 651. Photographs are not admissible if they are so gruesome as to overwhelm the jurors’ reason and lead them to convict the defendant without sufficient other evidence.
 
 State v. Craig,
 
 95-2499 (La.05/20/97), 699 So.2d 865,
 
 cert. denied,
 
 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997);
 
 State v. Tolbert,
 
 30,821 (La.App. 2 Cir. 8/19/98), 716 So.2d 949,
 
 unit denied,
 
 98-2562 (La.1/15/99), 736 So.2d 207. A trial court’s ruling in this regard will be disturbed only if the prejudicial effect of the photographs clearly outweighs the probative value.
 
 State v. Ruffins,
 
 32,-870 (La.App. 2 Cir. 12/10/99), 748 So.2d 614;
 
 State v. Washington, supra.
 

 During Dr. Erickson’s testimony, defense counsel raised an objection to the introduction of autopsy photographs. The jury was removed and arguments were presented. The trial' court ultimately ruled that the majority of the photographs were admissible. Dr. Erickson testified that he took thej^photographs of the victim’s body during the time he performed the autopsy. The objectionable photographs show the victim’s body and the various wounds, many of which had been sutured prior to the autopsy. Other photographs depict wounds that had sutures removed during the autopsy for examination purposes. Dr. Erickson testified that at least one. of the wounds was a result of medical intervention and had been sutured after the victim died. The trial judge carefully reviewed each of the photographs and determined that they were admissible, finding that they were not “unduly grotesque” and had probative value. The trial judge did exclude at least one photograph as it was determined to be repetitive.
 

 We have reviewed the photographs, and conclude that the trial judge did not err in his determination. They do depict a body with numerous ■ stab and cut wounds, as well as evidence of medical intervention
 
 *1118
 
 described by Dr. Erickson. They corroborated not only Dr. Erickson’s testimony but Emily Moore’s as well, as it related to the victim’s wounds. They showed the location, nature, and number of wounds sustained by the victim, and their probative value outweighed any prejudicial effect they might have had upon the jury. There is no showing that the photographs’ prejudicial effect was outweighed by their probative value.
 

 This assignment of error is without merit.
 

 |
 
 ^Conclusion
 

 For the foregoing reasons, we affirm the defendant’s conviction and sentence.
 

 CONVICTION AND SENTENCE AFFIRMED.
 

 [1]
 

 . The trial transcript incorrectly punctuates Richard's cell phone statement as, "She's stabbing me, Lisa, she's stabbing me,” as though Richard is talking to Lisa. Emily’s testimony makes it clear that Richard was identifying his assailant to her.